# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-16-00330-CR

Lamar Deruinte Harris, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
NO. 71752, THE HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

# M E M O R A N D U M   O P I N I O N

A jury convicted appellant Lamar Deruinte Harris of possession of a controlled substance with intent to deliver, cocaine, in an amount of four grams or more but less than 200 grams. *See* Tex. Health & Safety Code §§ 481.102, 481.112(a). Appellant elected to have the trial court assess his punishment, and the court sentenced appellant to 15 years in the Texas Department of Criminal Justice. *See id.* § 481.112(d); Tex. Penal Code § 12.32. On appeal, appellant complains about the denial of his motion to suppress and the trial court's admission of testimony relating to an incriminating response appellant made during the encounter with police. We affirm the judgment of conviction.

## BACKGROUND[1]

The evidence showed that law enforcement officers of the Central Texas Narcotics Task Force received information from an informant indicating that two men were trafficking narcotics from Room 227 of the Hallmark Inn and Suites in Killeen, a location in a high crime area that was known to law enforcement for narcotics trafficking and related criminal activities. The informant disclosed that one of the men resided in the motel room and that the other man, "a heavier-set, black male" who drove a white Chevrolet Camaro with a black top, supplied large amounts of drugs to the motel room resident.

Officers conducted extended surveillance on the room and frequently observed a white Chevrolet Camaro with a black top at that location. Officers were able to identify the person residing in the room but were unable to identify the driver of the Camaro. They did determine that the Camaro was a rental car belonging to Hertz Car Rental. The car had been rented by John Crawford, who was in default of the rental contract, and Hertz was trying to recover the vehicle. The officers also determined that Crawford was not the individual they observed driving the Camaro when it frequented the motel.

The officers ascertained Crawford's address and conducted surveillance on his residence, watching it for the Camaro, but the car was never observed there. On the occasions that the car was seen at the motel, the same unidentified person was driving it and the driver went in to

---

[1] Because the parties are familiar with the facts of the case, its procedural history, and the evidence adduced below, we provide only a general overview of the facts of the case here. We provide additional facts in the opinion as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.1, 47.4. The facts recited are taken from the testimony and other evidence presented at the suppression hearing and at trial.

Room 227. During their surveillance of the motel, police observed activity consistent with narcotics trafficking. Based on the information given by the informant, the observations made by police during surveillance, and further information obtained through independent investigation, police obtained a search warrant for the motel room and an arrest warrant for its occupant.[2]

From past experience, the officers were familiar with the Hallmark Inn and knew that the motel room doors were metal and very difficult to enter. So, concerned that the occupants of the room would have time to arm themselves or to dispose of the contraband if police attempted to gain entry at the door, the officers planned to intercept the motel resident outside of the room in the parking lot and then gain entrance into the motel room to execute the search warrant.

While waiting to intercept the resident of Room 227, the officers watched the motel and saw the white Camaro with the black top arrive at the location again. The Camaro backed into a parking space outside the motel room, as it had on previous occasions. The resident of the motel room was the passenger and appellant was the driver. Both exited the car. Law enforcement officers pulled into the parking lot, surrounding the car. Eight to ten officers wearing body armor with the word "POLICE" across the front exited their vehicles and converged on the Camaro with weapons drawn. At least one officer, Agent John Moseley, approached the car with his gun pointed at appellant.

When appellant saw the officers approaching, he got back into the Camaro and attempted to pull out. As Agent Mosely drew near the Camaro, before appellant got back in it, the

---

[2] The officers subsequently learned that the resident of the motel room, Tavaris Markey Thomas, is appellant's cousin, and that the person who rented the Camaro from Hertz, John Crawford, is appellant's stepfather.

3

officer detected a very strong odor of fresh (i.e., unburned) marijuana coming from the car. The officer based his conclusion concerning the smell of marijuana on his 27 years of experience as a narcotics officer. After getting back in the car, appellant moved it only a short distance before he was ordered by Agent Moseley to stop. Appellant complied with the directive. Agent Moseley then told appellant to step out of the car and opened the car door from the outside. Again, appellant complied. The officer told appellant that he smelled marijuana and asked appellant if he had marijuana in the car. Appellant responded, "Yes, and a whole lot more." Agent Moseley then detained appellant for further investigation, passed him to Deputy United States Marshal Kevin Scott, who was responsible for securing persons detained at the scene, and left the parking lot to assist in executing the search warrant on the motel room.

Deputy Scott handcuffed appellant for officer safety, noting that appellant had attempted to drive off when law enforcement had first approached. The deputy then conducted a pat down search, checking appellant's waistband and pockets for a weapon. He felt a lump in appellant's pocket. He squeezed the lump, manipulating it slightly, in order to make sure that it was not a weapon. In so doing, Deputy Scott concluded, based on his law enforcement experience, that the lump was likely a baggie of cocaine. Believing he knew what the lump was, Deputy Scott asked appellant, "Is that what I think it is?" Appellant answered, "Yes." The deputy then removed the baggie from appellant's pocket. The baggie contained a white powdery substance that Deputy Scott believed to be cocaine. Subsequent lab testing indicated that the baggie removed from appellant's pocket contained 55.71 grams of cocaine.

4

**DISCUSSION**

In his first two points of error, appellant challenges the trial court's denial, in part, of his motion to suppress, contending that the trial court abused its discretion by not suppressing the cocaine recovered from his pocket because Deputy Scott's pat down search was unlawful. In his third point of error, appellant contends that the trial court abused its discretion by admitting evidence of Agent Moseley's question regarding marijuana in the car and appellant's incriminating response.

**Denial of Motion to Suppress**

Appellant filed a pretrial motion to suppress, seeking to suppress the narcotics seized as a result of Deputy Scott's warrantless search of him and the statements he made responding to the officers' questions. In his motion (and at the suppression hearing), appellant asserted that when he was removed from the Camaro he was taken into custody. Consequently, according to appellant, the questioning by officers that ensued was, in reality, a custodial interrogation. Given the fact that he was not given his *Miranda* warnings prior to those questions,[3] appellant argued that the incriminating responses that he made after he was removed from the Camaro—his admission to Agent Moseley that he had marijuana in the car and his confirmation to Deputy Scott that the substance in his pocket was contraband—were inadmissible because he was subjected to custodial interrogation without being given his *Miranda* warnings in violation of his constitutional rights under the Fifth

---

[3] In their testimony at the suppression hearing, both Agent Moseley and Deputy Scott acknowledged that they did not give appellant *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966) (holding that prior to custodial interrogation, law enforcement officers must admonish accused of certain constitutionally protected rights to secure privilege against self-incrimination).

5

Amendment. Therefore, appellant argued, his statements should be suppressed. Appellant also objected to Deputy Scott's pat down search of his person and the seizure of cocaine from his pocket as a result of that search. He argued that the search exceeded the scope of a pat down for officer safety and, therefore, the cocaine recovered from his pocket should be suppressed.

The trial court conducted a hearing on the motion at which Agent Moseley and Deputy Scott testified.[4] At the suppression hearing, appellant maintained that he was in custody when he was removed from the Camaro. He argued that the circumstances under which he was removed deprived him of his freedom of action in a significant way. The State asserted that appellant was not in custody but only detained pursuant to an investigative detention until he was arrested after the cocaine was discovered in his pocket. At the conclusion of the suppression hearing, the trial court took the case under advisement. Subsequently, the trial court ruled on the motion to suppress in an email letter to the parties.

The court granted the motion in part and denied it in part. Without making detailed findings, the trial court concluded that appellant was arrested, not merely detained for an investigative detention, when he was removed from the Camaro. Consequently, the court concluded that because appellant was in custody at that point, the questioning of appellant concerning marijuana in the car or about the cocaine in his pocket without the benefit of his *Miranda* rights violated his constitutional rights under the Fifth Amendment. Thus, the court suppressed the evidence of those questions and appellant's responses. Though not explicitly stated, implied in the

_____

[4] As appellant notes in his brief, the officers' testimony at trial was consistent with their testimony at the suppression hearing.

court's ruling is the conclusion that appellant's arrest was a lawful custodial arrest. Accordingly, the trial court concluded that Deputy Scott's pat down search constituted a permissible search incident to arrest and, therefore, allowed the admission of the cocaine recovered from appellant's pocket during the pat down search.

In his first two points of error, appellant contends that the trial court erred in denying, in part, his motion to suppress and admitting the cocaine Deputy Scott recovered from his pocket. In his first point of error, he asserts that the arresting officers lacked probable cause to arrest him when he was removed from the Camaro and taken into custody and this lack of probable cause rendered his arrest unlawful. In his second point of error, appellant asserts that the pat down search following his illegal arrest exceeded the limited scope of a search for officer safety.

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion, *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006), and overturn the ruling only if it is outside the zone of reasonable disagreement, *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *Dixon*, 206 S.W.3d at 590. We apply a bifurcated standard of review, *State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017); *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016), giving almost total deference to a trial court's findings of historical fact and credibility determinations that are supported by the record, but review questions of law de novo, *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016); *Weems*, 493 S.W.3d at 577. We view the evidence in the light most favorable to the trial court's ruling, *Furr*, 499 S.W.3d at 877; *State v. Robinson*, 334 S.W.3d 776, 778 (Tex. Crim. App. 2011), and uphold the ruling if it is correct on any theory of law applicable to

7

the case, *Weems*, 493 S.W.3d at 577; *Absalon v. State*, 460 S.W.3d 158, 162 (Tex. Crim. App. 2015), even if the trial judge made the ruling for a wrong reason, *Story*, 445 S.W.3d at 732. In our review, "[t]he prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it." *Matthews v. State*, 431 S.W.3d 596, 601 n.5 (Tex. Crim. App. 2014). However, whether the facts, as determined by the trial court, add up to reasonable suspicion or probable cause is a question to be reviewed de novo. *State v. Ford*, — S.W.3d —, No. PD-1299-16, 2017 WL 4159087, at *3 (Tex. Crim. App. Sept. 20, 2017); *Byram v. State*, 510 S.W.3d 918, 923 (Tex. Crim. App. 2017).

Three distinct types of police-citizen interactions exist: (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration, which must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, which are only constitutional if supported by probable cause. *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013). Both investigative detentions and arrests are restraints on a person's freedom, but an arrest involves a greater degree of restraint. *State v. Sheppard*, 271 S.W.3d 281, 290 (Tex. Crim. App. 2008). Whether an encounter amounts to an arrest is a question of law that we review de novo. *Id.* at 291; *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

A person is arrested when he "has been actually placed under restraint or taken into custody." Tex. Code Crim. Proc. art. 15.22. A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App.

8

2013) (citing *Stansbury v. California*, 511 U.S. 318 (1994)); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). At least four general situations may constitute custody: (1) the suspect is physically deprived of his or her freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he or she cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe that his or her freedom of movement has been significantly restricted, and (4) there is probable cause to arrest and law enforcement officers do not tell the suspect that he or she is free to leave. *Saenz*, 411 S.W.3d at 496 (citing *Dowthitt*, 931 S.W.2d at 255). "We evaluate whether a person has been detained to the degree associated with arrest on an ad hoc, or case-by-case, basis." *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (citing *Dowthitt*, 931 S.W.2d at 255). In making this determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his or her movement comparable to formal arrest, given all the objective circumstances. *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984); *Stansbury*, 511 U.S. at 323). We look only to the objective factors surrounding the detention; the subjective beliefs of the detaining officer are not included in the calculation of whether a person is in custody. *Id.* at 372–73 (citing *Dowthitt*, 931 S.W.2d at 255).

No "bright-line rule" exists to distinguish between an investigative detention and an arrest; Texas courts categorize police actions as an arrest or a detention depending on several factors, including the amount of force displayed, the duration of detainment, the efficiency of the investigative process, whether the investigation is conducted at the original location or the person is transported to another location, the officer's expressed intent, and any other relevant factors. *Sheppard*, 271 S.W.3d at 291. In general, "[i]f the degree of incapacitation appears more than

9

necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation, this suggests the detention is an arrest." *Id.*

The record in this case reflects that multiple police vehicles converged on the Camaro, physically blocking it in. Approximately ten officers surrounded the Camaro and its occupants with weapons drawn. Appellant was prevented from leaving the parking lot and forced to exit the car at gunpoint. Agent Moseley testified that he pointed his weapon directly at appellant as he approached him and that he opened the Camaro door after directing appellant to get out of the car. Although appellant was not immediately handcuffed, the amount of police force used was significant. *See Garcia-Cantu*, 253 S.W.3d at 243 ("It is the display of official authority and the implication that this authority cannot be ignored, avoided, or terminated, that results in a Fourth Amendment seizure."). Under the circumstances reflected by the record, law enforcement officers here created a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. *See, e.g.*, *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citing "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled" as examples of circumstances that might indicate seizure); *Garcia-Cantu*, 253 S.W.3d at 243 (concluding that police action such as "boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority" will likely constitute Fourth Amendment seizure). In fact, both officers conceded at the suppression hearing that appellant was "deprived of his freedom of action in a significant way" and confirmed

that he was not free to leave. Appellant was, for all practical purposes, in custody and therefore under arrest.

In light of the above, we conclude that the seizure of appellant when he was removed from the Camaro was an arrest not a temporary investigative detention. Thus, given the appropriate standard of review, we agree with the trial court's legal conclusion that appellant was "not only being detained but [was] being arrested" at that point.

An arrest is valid under Texas law if the arresting officer had probable cause with respect to the person being arrested as well as statutory authority to make the arrest. *Neal v. State*, 256 S.W.3d 264, 280 (Tex. Crim. App. 2008); *Parker v. State*, 206 S.W.3d 593, 596 (Tex. Crim. App. 2006); *see* Tex. Code Crim. Proc. arts. 14.01–14.04. "Probable cause is a fluid concept that cannot be readily reduced to a neat set of legal rules." *Ford*, 2017 WL 4159087, at \*3; *see Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009); *see also Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.") (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "Although the concept evades precise definition, it involves 'a reasonable ground for belief of guilt' that is 'particularized with respect to the person to be searched or seized.'" *Ford*, 2017 WL 4159087, at \*3 (quoting *Baldwin*, 278 S.W.3d at 371); *see Pringle*, 540 U.S. at 371. "It is a greater level of suspicion than 'reasonable suspicion' but falls far short of a preponderance of the evidence standard." *Ford*, 2017 WL 4159087, at \*3; *Baldwin*, 278 S.W.3d at 371.

11

Probable cause for a warrantless arrest exists if, at the time the arrest is made, the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person to believe that the arrested person had committed or was committing an offense. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *Parker*, 206 S.W.3d at 599. The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer. *Amador*, 275 S.W.3d at 878; *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002). Further, "probable cause is evaluated based on the collective information known to the police[.]" *Campbell v. State*, 325 S.W.3d 223, 231 (Tex. App.—Fort Worth 2010, no pet.); *see Taylor v. State*, 82 S.W.3d 134, 138 (Tex. App.—San Antonio 2002, no pet.) ("'[W]hen there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest is to be considered in determining whether there was sufficient probable cause therefor.'") (quoting *Woodward v. State*, 668 S.W.2d 337, 344 (Tex. Crim. App. 1982)).

The relevant question here is whether, at the moment of appellant's arrest (i.e., his removal from the Camaro), the facts and circumstances within Agent Moseley's knowledge (or of which he had reasonably trustworthy information) were sufficient, from an objective perspective, to warrant a prudent person in believing that appellant had committed or was committing a criminal offense. *See State v. Woodard*, 341 S.W.3d 404, 412 (Tex. Crim. App. 2011); *see also Parker*, 206 S.W.3d at 599 ("[P]robable cause is the accumulation of facts which, when viewed in their

12

totality, would lead a reasonable police officer to conclude, with a fair probability, that a crime has been committed or is being committed by someone."). The record reflects that at the time Agent Moseley removed appellant from the Camaro, the facts and circumstances within Agent Moseley's knowledge and of which he had reasonably trustworthy information included:

- a confidential informant had informed Agent Moseley that narcotics were being trafficked out of Room 227 of the Hallmark Inn and Suites by two individuals—one man who was staying in the room and one man who was supplying the drugs to the motel resident;

- the motel was in a high crime area and was a location known to law enforcement for trafficking narcotics and related criminal activities;

- while conducting surveillance, law enforcement officers observed activity consistent with narcotics trafficking;

- through surveillance and independent investigation police determined the identity of the person staying in the motel room;

- although not able to identify appellant, police observed appellant frequent the room on several occasions driving a white Camaro with a black top;

- Agent Moseley determined that the Camaro appellant was driving was a rental car, that appellant was not an authorized driver, that the registered renter had defaulted on the contractual obligations to the rental car company, and that the company wanted the car back;

- appellant matched the informant's description of the person supplying drugs to the motel resident;

- based on the activity observed, independent investigation, and the corroboration of the informant's information, Agent Moseley concluded that appellant was the individual supplying narcotics to the motel resident;

- based on the information given by the informant, the observations made by police during surveillance, and further information obtained through independent investigation, police obtained a search warrant for the motel room and an arrest warrant for its occupant;

13

- while waiting to intercept the motel resident and execute the search warrant, police again observed appellant driving the white Camaro with the black top and parking the car in a parking spot near the motel room, consistent with prior observations;

- the motel resident, for whom police had secured an arrest warrant, was the passenger in the Camaro;

- police converged on the Camaro, and appellant, on seeing the police approaching, attempted to leave the scene; and

- Agent Moseley, a law enforcement officer with 27 years of experience as a narcotics investigator, smelled the overwhelming odor of fresh, not burned, marijuana emanating from the Camaro when he approached appellant.

These facts and circumstances were sufficient to warrant a prudent person to believe that appellant had committed or was committing a drug offense. *See, e.g.*, Tex. Health & Safety Code §§ 481.120 ("[A] person commits an offense if the person knowingly or intentionally delivers marihuana."), 481.121 ("[A] person commits an offense if the person knowingly or intentionally possesses a usable quantity of marihuana."). Thus, the record supports the trial court's implied conclusion of law that Agent Moseley had probable cause to arrest appellant when, in connection with the narcotics activity reported and observed, the officer smelled the odor of fresh marijuana.

Neither the Fourth Amendment nor Article I, Section 9, of the Texas Constitution requires a warrant to justify an arrest based upon probable cause. *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006); *see United States v. Watson*, 423 U.S. 411, 423–24 (1976) (Fourth Amendment does not prohibit public arrests upon probable cause); *Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998) (Article I, § 9 of Texas Constitution does not require warrant to effect arrest that is otherwise "reasonable"). The requirement of an arrest warrant is

14

purely statutory in Texas, governed by Chapter 14 of the Code of Criminal Procedure. *Buchanan*, 207 S.W.3d at 775; *see generally* Tex. Code Crim. Proc. arts. 14.01–.04 (listing situations under which police officer may arrest person without arrest warrant). Article 14.01(b) authorizes a peace officer to "arrest an offender without a warrant for any offense committed in his presence or within his view." Tex. Code Crim. Proc. art. 14.01(b). "An offense is deemed to have occurred within the presence or view of an officer when any of his senses afford him an awareness of its occurrence." *Steelman*, 93 S.W.3d at 107.

In this case, law enforcement officers received information that appellant was engaged in narcotics trafficking, they observed appellant engage in conduct consistent with narcotics trafficking, they identified appellant as the drug supplier, and Agent Moseley smelled a strong odor of fresh, not burned, marijuana immediately upon making contact with appellant before removing him from the Camaro. Thus, Agent Moseley was present for appellant's commission of a drug offense and had the statutory authority to arrest him for the drug offense without a warrant.

For the reasons set forth above, we conclude that the record supports the trial court's implied conclusion of law that, based on the totality of the circumstances, Agent Moseley had probable cause to arrest appellant without a warrant for an offense committed in his presence as well as the court's implied conclusion of law that appellant's removal from the Camaro was, therefore, a lawful custodial arrest. *See Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013).

"It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). More than four decades ago, the United States Supreme Court concluded that

[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and . . . in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*Id.* at 235. Thus, under the Fourth Amendment, police officers may search an arrestee incident to a lawful custodial arrest without a warrant. *State v. Granville*, 423 S.W.3d 399, 410 (Tex. Crim. App. 2014) (citing *Robinson*, 414 U.S. at 224–26); *see United States v. Edwards*, 415 U.S. 800, 802 (1974) (recognizing that search incident to arrest is one of exceptions to prevailing rule that searches and seizures may not be made without warrant under Fourth Amendment); *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003) (same).

The justification for permitting such a warrantless search is (1) the need for officers to seize weapons or other things which might be used to assault on officer or effect an escape, and (2) the need to prevent the loss or destruction of evidence. *Granville*, 423 S.W.3d at 410; *see Edwards*, 415 U.S. at 802–03 (noting that search incident to arrest exception "has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained"); *Robinson*, 414 U.S. at 234 (observing that justification for authority to search incident to lawful arrest rests as much on need to disarm suspect in order to take him into custody as it does on need to preserve evidence on his person). Thus, a search incident to arrest permits officers to search a defendant, or areas within the defendant's immediate control, in order to remove any weapons that the arrestee may seek to use to resist arrest or effect escape. *Chimel v. California*, 395 U.S. 752, 763 (1969); *Granville*,

16

423 S.W.3d at 410. In addition, a search incident to arrest allows an officer to search for and seize any evidence on the arrestee's person to prevent its concealment or destruction. *Chimel*, 395 U.S. at 763; *Granville*, 423 S.W.3d at 410; *McGee*, 105 S.W.3d at 615–16.

In this case, Deputy Scott testified at the suppression hearing that he conducted the pat down search of appellant to check for concealed weapons. In doing so, he located the baggie of cocaine on appellant's person, in the pocket of his pants. The deputy immediately recognized the lump he felt as contraband. Under the circumstances here, we conclude that the trial court did not abuse its discretion in concluding that Deputy Scott's pat down search of appellant constituted a search incident to arrest that could be conducted without a warrant. *See Ford*, 2017 WL 4159087, at *3 ("If an officer has probable cause to arrest, a search incident to arrest is valid if conducted immediately before or after a formal arrest."); *see also State v. Sanchez*, — S.W.3d —, No. PD-1037-16, 2017 WL 4273603, at *4 (Tex. Crim. App. Sept. 27, 2017) ("The formalities associated with arrest do not seem to matter to the Supreme Court in the search-incident-to-arrest context as long as the arrest was close in time to the search and the requisite probable cause to arrest (that justifies the arrest and search) arose before the search."); *see, e.g.*, *Chimel*, 395 U.S. at 762–63 (officer who had made full-custody arrest of defendant for driving car without permit could conduct warrantless search of defendant as part of that arrest; when officer found crumpled cigarette pack in defendant's pocket, he could seize heroin capsules that he found within pack).

In sum, the record supports the trial court's legal conclusions, both explicit and implied, that appellant was arrested when he was removed from the Camaro, that the arrest was lawful—supported by probable cause and made with statutory authority, and that the ensuing pat

17

down search was a permissible search incident to a lawful custodial arrest. Accordingly, viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the trial court abused its discretion by denying, in part, appellant's motion to suppress and admitting the cocaine recovered from appellant's pocket. We overrule appellant's first and second points of error.

### Admission of Suppressed Evidence

During trial, notwithstanding its pretrial ruling on appellant's motion to suppress, the trial court admitted evidence of Agent Moseley's question to appellant regarding marijuana in the Camaro and appellant's incriminating response because appellant had "opened the door" to that evidence during opening statement.

Appellant's counsel began his opening statement by stating that "[t]he police have a legal right to detain a citizen if the police have a reasonable suspicion that that person having [sic] engaged in, is engaging in or is about to engage in criminal activity." He then explained that "[i]n that situation, the police can do a protective search or a pat-down search of that person to determine if that person has weapons." Counsel then read portions of the officers' testimony from the suppression hearing and then asserted that "the search [in this case] was limited to protective -- protective search, to a pat down."[5] Appellant's counsel concluded his opening statement by expressing the belief that if the jury "follow[ed] the constitutional principles that

---

[5] The State did not immediately object to appellant's counsel reading portions of the record of the suppression hearing during opening statement, but did eventually object "because there's a lot more to the transcript than what the jury is going to hear." The trial court sustained the State's objection.

18

apply," the evidence that would be presented—"these police officers' own testimony, their own words"—would show that

> [the officers] exceeded the type of search, the pat-down search that the law allows them to make in this circumstance. And [the jury's] verdict in that case, even though the drugs were found on [appellant], and even though it was two ounces or more, the verdict has to be not guilty.

After appellant's opening statement, the State sought permission to introduce the previously suppressed evidence of Agent Moseley's question and appellant's response because, the State asserted, appellant had "opened the door" and left a false impression with the jury during opening statement. The State maintained that appellant opened the door to the admission of the suppressed question and response because in his opening statement appellant proffered the defensive theory that the pat down search was unlawful. The prosecutor asserted that the suppressed evidence "[became] admissible to show that the officers conducted a valid and legitimate search based on probable cause" and appellant's incriminating response to Agent Moseley's question about marijuana gave the officers probable cause to search him.

The trial court agreed that appellant opened the door and allowed the State to offer, during its case in chief, testimony from Agent Moseley about his question to appellant concerning marijuana in the Camaro and appellant's incriminating response. In his third point of error, appellant argues that the trial court erred in doing so.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016); *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.). An abuse of discretion does not occur

unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless the determination "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley*, 493 S.W.3d at 83. An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93; *Sandoval*, 409 S.W.3d at 297.

Evidence that is otherwise inadmissible may become admissible if a party "opens the door" to such evidence. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009); *Sandoval*, 409 S.W.3d at 302. A party opens the door by leaving a false impression with the jury that invites the other side to respond. *Hayden*, 296 S.W.3d at 554; *Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005); *Sandoval*, 409 S.W.3d at 302. When a party opens the door, opposing counsel is permitted to present otherwise inadmissible evidence to correct the mistaken or false impression. *Houston v. State*, 208 S.W.3d 585, 591 (Tex. App.—Austin 2006, no pet.); *see Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002). The door to inadmissible evidence may be "opened" during opening statement. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (defense opening statement may open door to otherwise inadmissible evidence to rebut defensive theory presented in that opening statement); *see Gaytan v. State*, 331 S.W.3d 218, 225 (Tex. App.—Austin 2011, pet. ref'd) (if opening statement presents defensive theory, it opens door to otherwise inadmissible rebuttal evidence).

20

The door to inadmissible evidence may even be opened to statements that are inadmissible because they were obtained during custodial interrogations conducted without *Miranda* warnings. *Haywood v. State*, No. 01-13-00994-CR, 2014 WL 7131176, at *3 (Tex. App.—Houston [1st Dist.] Dec. 11, 2014, pet. ref'd) (mem. op., not designated for publication); *see Harris v. New York*, 401 U.S. 222, 224–25 (1971) (defendant opened door to statement taken in violation of *Miranda* to be used for impeachment purposes); *see, e.g.*, *Haywood*, 2014 WL 7131176, at *4 (appellant opened door to admission of his otherwise inadmissible (and suppressed) oral statements that he fired gun and that gun was not in his apartment to correct false impression that officer conducted shoddy investigation by failing to bag appellant's hands to preserve evidence for gunshot residue test and by not obtaining search warrant for appellant's apartment to look for gun); *Sandoval v. State*, No. 14-05-00389-CR, 2006 WL 3433805, at *1–2 (Tex. App.—Houston [14th Dist.] Nov. 30, 2006, pet. ref'd) (mem. op., not designated for publication) (appellant opened door to admission of his otherwise inadmissible (and suppressed) oral statement that he purchased drugs to explain detective's failure to request handwriting analysis and correct false impression with jury).

"Opening the door," however, is limited in scope. *Wendell v. State*, No. 03-09-00534-CR, 2011 WL 115666, at *4 (Tex. App.—Austin Jan. 12, 2011, pet. ref'd, untimely filed) (mem. op., not designated for publication); *see Schultz v. State*, 957 S.W.2d 52, 71 (Tex. Crim. App. 1997). The party offering the otherwise inadmissible evidence to correct the false impression may not "stray beyond the scope of the invitation." *Feldman v. State*, 71 S.W.3d 738, 756 (Tex. Crim. App. 2002) (quoting *Schultz*, 957 S.W.2d at 71). In this case, while it is true that appellant challenged the legality of Deputy Scott's pat down search in his opening statement, we

21

observe that appellant's discussion was limited to the issue of the police exceeding the scope of a protective pat down during an investigative detention. We are not certain such a limited discussion invites evidence of appellant's incriminating response to establish probable cause for searching appellant's person. A protective pat down search and a search pursuant to probable cause are distinct types of searches—one conducted for officer safety, the other for criminal investigative purposes—that differ as to levels of intrusion and, therefore, requisite levels of suspicion. *Compare Carmouche v. State*, 10 S.W.3d 323, 329 (Tex. Crim. App. 2000) ("Law enforcement personnel may conduct a limited search for weapons of a suspect's outer clothing, even in the absence of probable cause, where an officer reasonably believes that the suspect is armed and dangerous."), *with Parker*, 206 S.W.3d at 597 ("'Probable cause to search exists when reasonably trustworthy facts and circumstances within the knowledge of the officer on the scene would lead a man of reasonable prudence to believe that the instrumentality of a crime or evidence of a crime will be found.'") (quoting *Estrada v. State*, 154 S.W.3d 604, 609 (Tex. Crim. App. 2005)). However, we need not resolve the question of whether the complained-of previously suppressed evidence exceeded the scope of the invitation of appellant's opening statement because, even assuming that the trial court erred by admitting Agent Moseley's testimony about his question and appellant's response, the admission of the evidence was not harmful.

The erroneous admission of evidence is non-constitutional error. *Sandoval*, 409 S.W.3d at 287; *see Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* Tex. R. App. P. 44.2(b); *Barshaw*, 342 S.W.3d at

22

93; *Sandoval*, 409 S.W.3d at 287. "'A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.'" *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance the error did not influence the jury, or influenced the jury only slightly. *Barshaw*, 342 S.W.3d at 93; *Sandoval*, 409 S.W.3d at 287.

In assessing potential harm, our focus is not on whether the outcome of the trial was proper despite the error but on whether the error had a substantial or injurious effect or influence on the jury's verdict. *Barshaw*, 342 S.W.3d at 93–94; *Sandoval*, 409 S.W.3d at 287–88. We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Barshaw*, 342 S.W.3d at 93; *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (in conducting harm analysis "we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence"). We consider all the evidence that was admitted at trial, the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Sandoval*, 409 S.W.3d at 288. We may also consider the jury instructions, the parties' theories of the case, closing arguments, voir dire, and whether the State emphasized the error. *Barshaw*, 342 S.W.3d at 94; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *Sandoval*, 409 S.W.3d at 288. The weight of evidence of the defendant's guilt is also relevant in conducting a harm analysis under Rule 44.2(b). *Neal*, 256 S.W.3d at 285; *Motilla v. State*, 78 S.W.3d 352, 356–57 (Tex. Crim. App. 2002).

23

In the instant case, the jury heard testimony from Agent Moseley that, based on corroborated information of a police informant, police surveillance of the suspected narcotics trafficking location, and independent investigation conducted by law enforcement, police concluded that appellant was involved in trafficking narcotics out of the motel room in question. Specifically, police concluded that appellant was supplying the drugs to the motel resident. The jury also heard evidence that when Agent Moseley approached the Camaro appellant was driving (as appellant was getting back in the car to attempt to leave the scene), the officer smelled the "overwhelming" odor of fresh marijuana coming from the car. Further evidence showed that appellant was driving a rental car, that he was not an authorized driver of that car, and that rental cars are commonly used by drug traffickers. Finally, the jury received evidence demonstrating that appellant had 55.71 grams of cocaine in the pocket of his pants, an amount that the evidence reflected was indicative of someone involved in the distribution of narcotics.

Considering the evidence as a whole, we conclude that the evidence supporting the jury's verdict was strong and whether the previously suppressed evidence at issue was admitted does not strengthen or detract from that evidence. Given the state of the record, the complained-of evidence was fairly innocuous. We also note the State's limited focus on the evidence. Only one witness, Agent Moseley, testified about the question and response, and the State made only one brief reference to that testimony in closing argument, instead focusing on the cocaine recovered directly from appellant's person and the evidence demonstrating his involvement in drug trafficking. Removing the officer's question and appellant's response from consideration, there remains significant evidence supporting the jury's finding of guilt.

24

Therefore, given the evidence in the record, we have fair assurance that hearing the brief testimony concerning the previously suppressed question and response did not influence the jury, or influenced the jury only slightly. Thus, because the error, if any, did not have a substantial and injurious effect or influence in determining the jury's verdict, it did not affect appellant's substantial rights. Accordingly, the trial court's error, if any, was harmless. We overrule appellant's third point of error.

## CONCLUSION

We conclude that the trial court did not abuse its discretion by denying, in part, appellant's motion to suppress and admitting the cocaine recovered from appellant's pocket. We further conclude that any error in the admission of the previously suppressed evidence of Agent Moseley's question and appellant's incriminating response was harmless. Accordingly, we affirm the trial court's judgment of conviction.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Bourland

Affirmed

Filed: December 7, 2017

Do Not Publish

25